UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
WAYNE CHIN,                                          :
                    Plaintiff,                        :
                                 :     **<u>OPINION AND ORDER</u>**
v.                                                   :
                                 :     15 CV 7860 (VB)
FREDERICK BURNSTEIN, HARIP                            :
CHAKRAVORTY, DOCTOR BENHEIN,                          :
BETSY KELLY, JERRERY HALE, JOHN                       :
DOE #1, JOHN DOE #2, JOHN DOE #3,                     :
                    Defendants.                      :
--------------------------------------------------------------x

Briccetti, J.:

Plaintiff Wayne Chin, proceeding <u>pro se</u> and <u>in forma pauperis</u>, brings this action against

defendants Frederick Burnstein, Dr. Harip Chakravorty, Dr. Benhein, Betsy Kelly, Jerrery Hale,

and John Does #1–3, under 42 U.S.C. § 1983 for alleged deliberate indifference to his medical

needs in violation of the Eighth Amendment.

Before the Court is defendants' motion to dismiss the complaint for failure to state a

claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  (Doc. #27).

For the reasons set forth below, the motion to dismiss based on Rule 12(b)(6) is

GRANTED as to defendants Chakravorty and Burnstein; as to the remaining defendants, the

motion to dismiss is converted to a motion for summary judgment, Fed. R. Civ. P. 12(d), 56, and

that motion is also GRANTED.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

For purposes of ruling on a motion to dismiss, the Court accepts all factual allegations of

the complaint as true, and draws all reasonable inferences in plaintiff's favor.  "In considering a

motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may

consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  Because plaintiff references three grievances in his complaint, the Court properly considers these grievances.

On May 24, 2012, plaintiff visited the medical clinic at Green Haven Correctional Facility ("Green Haven").  He met with Dr. Chakravorty and complained of "urina[ry] complications, [and] pain from the bottom of his stomach to the tip of his penis."  (Compl. ¶10). Plaintiff requested Dr. Chakravorty refer him to a urologist.  Plaintiff does not allege whether Dr. Chakravorty diagnosed plaintiff, but does allege Dr. Chakravorty did not refer plaintiff to a urologist or provide any medication.

On May 31, 2012, Dr. Chakravorty had a blood sample drawn and ordered a Prostate-Specific Antigen ("PSA") test.[1]  Plaintiff had previously undergone PSA tests on August 9, 2009, and December 23, 2009.  The results of those tests were 1.86 nanograms of PSA per milliliter of blood ("ng/ml") and 2.2 ng/ml, respectively.  Plaintiff's May 31, 2012, test returned a result of 3.37 ng/ml.  Dr. Chakravorty did not prescribe medication or other treatment.

On August 23, 2012, plaintiff visited sick call complaining of lower back pain, abdominal cramping, and urinary complications.  Plaintiff was scheduled for an appointment with Dr. Chakravorty.  At the appointment on August 27, 2012, plaintiff informed Dr. Chakravorty he was still experiencing the same symptoms, requested a referral to a urologist, and either a magnetic resonance imaging ("MRI") or an ultrasound of his urinary tract to diagnose his illness. Dr. Chakravorty denied these requests.

---

[1]    Plaintiff alleges a PSA level below 4.00 ng/ml is normal, whereas a greater level increases the risk for prostate cancer.

On September 7, 2012, plaintiff again visited sick call, and he was scheduled for another appointment with Dr. Chakravorty.  At an examination on September 17, 2012, plaintiff complained to Dr. Chakravorty that he continued to experience the same symptoms and repeated his request for medical tests, including a PSA test, MRI, ultrasound, and/or urologist examination.  Dr. Chakravorty did not offer treatment for plaintiff's symptoms, but submitted a urologist referral consent to Dr. Burnstein, the Facility Health Services Director at Green Haven, who allegedly denied it.

On September 27, and October 2, 2012, plaintiff visited sick call to request an appointment with Dr. Chakravorty.  On October 3, 2012, plaintiff returned to Dr. Chakravorty complaining of urinary complications.  Dr. Chakravorty examined plaintiff and determined that neither an MRI nor an ultrasound of plaintiff's kidneys and bladder was warranted.

On January 28, 2013, plaintiff visited the facility clinic and was seen by Dr. Chakravorty. Plaintiff complained of pain and suffering arising from urinary complications.  Dr. Chakravorty reviewed an x-ray image of plaintiff's lower back.[2]  This image indicated no deformity of the spine.  Plaintiff was dismissed without medication.

On April 17, 2013, plaintiff visited the facility clinic because he was experiencing urinary retention.  Dr. Benhein, the treating physician, instructed two nurses, Kelly and Doe #1, to insert a catheter in plaintiff's urethra to release the pressure on his bladder.  Dr. Benhein also instructed the nurses to contact the urologist at Putnam Hospital Center to arrange for plaintiff to be admitted.  Plaintiff had a urine sample taken, which showed no signs of infectious microorganisms.  Plaintiff alleges Dr. Benhein did not perform any tests himself, nor did he

---

[2]      Plaintiff does not allege when this x-ray was taken.

supervise the nurses.  The nurses then inserted an allegedly unsterilized Foley catheter rather than a straight catheter and were unable to contact Putnam Hospital Center.  Instead, plaintiff was admitted to Green Haven's infirmary for observation until his discharge on April 18, 2013. Plaintiff received a prescription for Tamsulosin, a drug used to treat benign prostate hyperplasia ("BPH"), which is an enlarged prostate.

On April 21, 2013, plaintiff presented at emergency sick call and informed the nurse on duty he had a urinary bacterial infection and needed urgent treatment.  The nurse informed Dr. Bhopale of plaintiff's complaint.  Plaintiff was not prescribed medication, but was scheduled for an appointment with Dr. Chakravorty the next morning.  At that appointment, plaintiff informed Dr. Chakravorty of his infection and complained the Tamsulosin caused a variety of unpleasant side effects, including headaches, blurred vision, and nausea.  Dr. Chakravorty did not prescribe an alternative to Tamsulosin and did not provide plaintiff with antibiotics.

On April 25, 2013, plaintiff had a urine sample taken and sent for urinalysis testing.  The results of the urinalysis were reported on April 28, 2013, and revealed "many" infectious microorganisms in plaintiff's urine.  (Compl. at ¶ 27, Ex. 1).  On April 28, 2013, Dr. Chakravorty provided plaintiff with a ten-day supply of Ciprofloxacin, an antibiotic.  Plaintiff alleges that the treatment did not cure the infection and he developed chronic bacterial prostatitis.[3]

On May 9, 2013, Dr. Chakravorty examined plaintiff, but plaintiff refused a digital rectal exam of his prostate, and his requested urologist referral was denied.  Plaintiff alleges that at some point in May 2013 his PSA level was 5.58 ng/ml.

---

[3]    Plaintiff alleges that chronic bacterial prostatitis is a bacterial infection in the prostate lasting for more than three months.

On May 12, 2013, plaintiff filed his first grievance in this matter, designated GH-75170-13 ("the first grievance").  It alleges plaintiff complained to Dr. Chakravorty of constant pain in the left side of his back on numerous occasions.  The first grievance also describes the April 17, 2013, emergency visit described above, but contains no allegation of wrongdoing on the part of Dr. Burnstein.  The first grievance does not name Kelly nor state any wrongdoing with respect to Kelly or any other nurse.  The first grievance claims Dr. Chakravorty told plaintiff that his request for an examination by a urologist had been denied "by the administration."  (Doc. #30, Ex. C).

On June 20, 2013, Dr. Chakravorty, citing plaintiff's 5.58 ng/ml PSA level, referred plaintiff to a urologist requesting a biopsy be performed on plaintiff's prostate.

On July 7, 2013, plaintiff presented at sick call complaining of pain in his lower back, hips, thigh, and lower legs.  Plaintiff alleges these are symptoms of prostatitis.

On July 21, 2013, Dr. Janis, a urologist, examined plaintiff and performed an ultrasound on plaintiff's prostate, noted abnormalities, and ordered a biopsy.  On July 31, 2013, Dr. Janis diagnosed plaintiff with BPH and a recurrent bacterial infection.

On September 10, 2013, Dr. Janis performed a biopsy, the results of which confirmed that BPH, not prostate cancer, was causing plaintiff's symptoms.  Dr. Janis prescribed Tamsulosin.

On October 10, 2013, plaintiff returned to the facility clinic complaining of a recurrent urinary infection.  Dr. Chakravorty prescribed plaintiff a ten-day course of Ciprofloxacin.

On two occasions, November 19, 2013, and December 2, 2013, plaintiff reported to the facility medical staff that the Tamsulosin had not cured his urinary complications and recurring

bacterial infections.[4]  Plaintiff alleges prostate surgery should have been approved at that stage, but he does not state whether this was discussed with the treating physician, who is not named.

Plaintiff alleges that by January 27, 2014, his PSA level had elevated to 8.00 ng/ml.

On April 24, 2014, Dr. Janis again examined plaintiff and recommended a cystoscopy to examine plaintiff's prostate.  On July 22, 2014, Dr. Janis performed a cystourethroscopy examination of plaintiff's prostate and bladder.  Dr. Janis confirmed plaintiff suffered from "recurrent urinary tract infections[,] 'BPH' symptoms[, and] slowing of the urinary stream." (Compl. ¶42).  Dr. Janis recommended a transurethral resection of the prostate, a surgery that plaintiff alleges would eliminate many of his symptoms.  In addition, Dr. Janis prescribed Ciprofloxacin.  Plaintiff alleges that, at this point, his prolonged use of "Tamsulosin and Finasteride medications . . . threaten[ed] extensive damage to [his] kidneys, bladder[,] and the risk of impotence."  (Compl. ¶43).

On September 24, 2014, plaintiff's primary care provider referred plaintiff's case to Dr. Burnstein, who denied plaintiff's request for approval of the surgery.

On November 17, 2014, plaintiff visited the medical clinic complaining of "inflammation of the urethra, rectal, and perineal pain, lower back aches and other urinal bacterial symptoms." (Compl. ¶45).  Dr. Wolf prescribed Ciprofloxacin and ordered urine and blood tests.  The results of those tests came back nine days later, at which point plaintiff was switched from Ciprofloxacin to Sulfamethox, a different antibiotic.  No explanation was given for this change.

---

[4]      As previously noted, Tamsulosin is a medication used to treat BPH, not bacterial infections.  The complaint does not explain why plaintiff believed Tamsulosin would cure or treat his recurring infections.

He alleges that, at this point, he was still unaware he had chronic bacterial prostatitis.[5]  Plaintiff

had his family research Sulfamethox, and it was only because of their "research of the antibiotics

that plaintiff became aware of the nature and severity of the recurring urina[ry] bacterial

infections."  (Compl. ¶45).

Plaintiff filed a second grievance regarding this matter on November 27, 2014,

designated GH-78404-14 ("the second grievance").  In the grievance, plaintiff alleges he was not

properly informed about his health or the reason certain drugs had been prescribed to him.  He

further alleges that, only because of his family's research did he become aware that he suffered

from acute bacterial prostatitis.  The grievance states, "I believe that the authority in this facility

has show[n] indifference to my medical needs in order to save money."  (Doc. #30, Ex. D).

On November 28, 2014, a computer tomography scan ("CT scan") was performed at

Putnam Hospital Center, at the direction of Dr. Burnstein.  The CT scan allegedly showed that

plaintiff's bladder had "largely collapsed."  (Compl. ¶47).  Plaintiff alleges his primary care

physician and Dr. Burnstein withheld this information from plaintiff.

On January 29, 2015, plaintiff alleges he exhausted his administrative remedies.  As

support for this allegation, plaintiff attaches the decision of the Central Office Review

Committee ("CORC") regarding his second grievance.  Plaintiff alleges this grievance gave

defendant Hale, the Assistant Director of the Inmate Grievance Program ("IGP"), notice that

plaintiff's bladder had collapsed and Hale conspired to conceal this information.  The second

grievance does not mention of plaintiff's collapsed bladder.  Plaintiff also alleges Hale, in his

---

[5]     It is unclear whether this allegation is meant to state that plaintiff was unaware he
suffered from a new bout of the disease, or whether he had never been given this diagnosis.

supervisory capacity, allowed Green Haven's unconstitutional practices of denying medical treatment to inmates to continue.

On February 10, 2015, plaintiff saw his primary care physician regarding his BPH-related symptoms.  Plaintiff's primary care physician "informed [p]laintiff that he could not understand why his superiors w[]ere denying and delaying approval for the surgical operation and had cancelled all further appointment[s] with Dr. Janis."  (Compl. ¶50).  Plaintiff's primary care physician referred plaintiff to Dr. Janis.

On March 20, 2015, Dr. Janis examined plaintiff and instructed plaintiff to complete a prostate-severity form.  Plaintiff alleges that completing this form was a prerequisite to receiving prostate surgery.  Plaintiff attaches the completed prostate-severity form, which asks seven questions relating to urination on a zero-to-five scale.  Plaintiff alleges Dr. Burnstein "used [this] simple questionnaire as a superficial unjustifiable reason to prolong [p]laintiff's pain and suffering," because plaintiff's collapsed bladder and recurring bacterial infections demonstrated his need for the requested surgery.  (Compl. ¶51).  Plaintiff does not explain how his collapsed bladder and bacterial infections relate to his requested surgery, which he alleges is performed to ameliorate symptoms caused by BPH.

On June 1, 2015, plaintiff was admitted to Putnam Hospital Center due to complications relating to chest pain.  Plaintiff informed the treating physician of his urinary problems.  Plaintiff alleges the physician wanted to have him examined by the hospital urologist, but the Green Haven medical staff instructed the physician to not refer plaintiff to a urologist.  The physician continued the Tamsulosin.

On June 5, 2015, plaintiff reviewed his medical file.

On June 19, 2015, plaintiff confronted his primary care physician and stated the medical staff had concealed his collapsed bladder.  Plaintiff asked his primary care physician about potential treatment, but the primary care physician "could not articulate what corrective medical measure would be taken to rehabilitate [p]laintiff's bladder."  (Compl. ¶55).

On July 1, 2015, plaintiff filed a third grievance, designated GH-80150-15 ("the third grievance").  By August 6, 2015, plaintiff had not received a determination on this grievance, and plaintiff submitted a letter to Superintendent Thomas Griffin, which plaintiff alleges appealed the decision to the second stage of the IGP.  On August 13, 2015, the Grievance Committee conducted a hearing and informed plaintiff he was scheduled for surgery with Dr. Janis on August 25, 2015.  Plaintiff alleges he appealed this decision because he felt his surgery was unnecessarily delayed.

Dr. Janis operated on plaintiff on August 25, 2015.  Plaintiff alleges the long period of time between his initial complaint and the surgery resulted in "serious injuries to his reproductive and urinal organs, pain and mental anguish, insomnia, appetite disturbance, fretful anxiety, and suicidal urges due to sleepless nights caused by urinal complications."  (Compl. ¶59).

When Superintendent Thomas did not render a decision on the third grievance by September 16, 2015, plaintiff wrote a letter asking him to pass his appeal through to CORC.

Plaintiff filed the complaint in this case on October 5, 2015.

On December 2, 2015, the Court ordered the Attorney General for the State of New York to ascertain the identities and addresses of the John Doe defendants and provide this information to plaintiff.  (Doc. #5).  The Court informed plaintiff, "[w]ithin thirty days of receiving this information, plaintiff must file an amended complaint naming the John Doe defendant(s)."  (Doc. #5 at 3).  On January 28, 2016, defense counsel filed a letter stating that John Does #2 and #3

appear to be Dr. Burnstein.[6]  On July 5, 2016, defense counsel filed a letter stating the belief that John Doe #1 is nurse Ferdinand Teye, along with Teye's service address.  (Doc. #34).  Plaintiff did not file an amended complaint.[7]

According to plaintiff's affidavit submitted in opposition to defendants' motion to dismiss, on April 21, 2016, CORC received plaintiff's appeal with respect to the third grievance.

## DISCUSSION

I.    Motion to Dismiss Under Rule 12(b)(6) Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility."  Id. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

---

[6]     Plaintiff alleges Does #2 and #3 were the Facility Health Services Directors at Green Haven.  According to the Attorney General's letter, there is only one such director, who was and is Frederick Bernstein, sued here as "Burnstein."  Thus, the Court treats all references, allegation and claims against Does #2 and #3 as claims and allegations with respect to Burnstein.

[7]     The analysis with respect to John Doe #1, even if named, would be the same as with respect to Kelly.  Thus, for the reasons the Court dismisses the claims against Kelly, it would also dismiss the claims against Doe #1, such that granting leave to amend would be futile.

reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court must liberally construe submissions of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

II.     Rule 56 Motion for Summary Judgment Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See id. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."

Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted).  The "mere existence of a scintilla of evidence in support" of the non-moving party's position is likewise insufficient; "there must be evidence on which the jury could reasonably find" for him.  Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial.  Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

III.    Failure to Exhaust

Defendants Dr. Benhein, Kelly, and Hale argue the Court should dismiss the claims against them under Rule 12(b)(6) or, in the alternative, under Rule 56, because plaintiff failed to exhaust his administrative remedies, which the Prison Litigation Reform Act ("PLRA") requires. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under . . . Federal law[] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").

Failure to exhaust is an affirmative defense under the PLRA.  Jones v. Bock, 549 U.S. 199, 216 (2007).  Thus, "[d]ismissal under Rule 12(b)(6) for failure to exhaust is . . . appropriate only where nonexhaustion is apparent from the face of the complaint."  Roland v. Smith, 907 F. Supp. 2d 385, 388 (S.D.N.Y. 2012).

For a New York state prisoner to exhaust a claim, he must comply with New York's IGP with respect to that claim.  The inmate must complete three steps: (i) submit a complaint to the clerk of the Inmate Grievance Resolution Committee ("IGRC"), (ii) appeal the decision to the superintendent, and (iii) appeal to CORC.  N.Y. COMP. CODES R. & REGS. tit. 7 § 701.5.  The IGRC "hearing [shall] take place within 16 calendar days after receipt of the grievance."  N.Y. COMP. CODES R. & REGS. tit. 7 § 701.5(b)(2)(ii).  "If a matter concerns an institutional issue, the superintendent shall render a decision on the grievance and transmit said decision, with reasons stated, to the grievant . . . within 20 calendar days from the time the appeal was received."  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(c)(3)(ii).  "Absent [an] extension, matters not decided within the time limits may be appealed to the next step."  N.Y. COMP. CODES R. & REGS. tit. 7 § 701.6.

Here, nonexhaustion is not apparent from the face of the complaint.  The complaint

alleges, although in a conclusory fashion, plaintiff fully exhausted his administrative remedies,

and it contains no allegation, on its face, demonstrating plaintiff failed to do so.  Rather, at most,

it omits certain allegations showing exhaustion.  Accordingly, the Court cannot dismiss the

complaints against Dr. Benhein, Kelly, and Hale under Rule 12(b)(6).  See McCoy v. Goord, 255

F. Supp. 2d 233, 251 (S.D.N.Y. 2003).

Instead, the Court converts defendants' Rule 12(b)(6) motion to dismiss into a Rule 56

motion for summary judgment on the limited issue of exhaustion.  Roland v. Smith, 907 F. Supp.

2d at 388.  Rule 12(d) permits a moving party to submit evidence on such a matter and requires

the Court to give all parties a reasonable opportunity to present relevant evidence.[8]

The Court will address summary judgment with respect to Dr. Benhein and Kelly, before

addressing summary judgment with respect to Hale.

A.      Dr. Benhein and Kelly

Plaintiff's claims against Dr. Benhein and Kelly relate only to the medical treatment

rendered on April 17, 2013.  Only the first and third grievances relate to the events of April 17,

2013, and therefore the Court will address whether plaintiff exhausted his administrative

remedies via either grievance.

Defendants argue the first grievance did not provide notice of plaintiff's claims regarding

the conduct of these actors and plaintiff did not fully appeal the third grievance through CORC

prior to plaintiff filing this lawsuit.

---

[8]      Defendants complied with Local Civil Rule 12.1, which requires that "[a] represented
party moving to dismiss . . . against a party proceeding pro se, who refers in support of the
motion to matters outside the pleadings . . ., shall serve and file" a required notice, which
includes the full text of Rule 56.  (Doc. #29).

The Court addresses each argument in turn.

In his opposition to the pending motion, plaintiff does not argue the first grievance exhausted his claims against Dr. Benhein and Kelly.

Despite this implicit concession, given plaintiff's pro se status, the Court will nevertheless analyze the sufficiency of the first grievance and whether it sufficiently exhausted his claims against Dr. Benhein and Kelly.

The exhaustion requirement "is not dissimilar to the rules of notice pleading," as it is, in part, "designed to 'afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'"  Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004), overruled on other grounds by Woodford v. Ngo, 548 U.S. 81, 94–95 (2006) (quoting Porter v. Nussle, 534 U.S. 516 (2002)).  The IGP requires a grievance "contain a concise, specific description of the problem."  N.Y. COMP. CODES R. & REGS., tit. 7, § 701.5(a)(2).  "Express identification" of all parties is not required.  Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009) ("Because New York's IGP does not articulate an identification requirement, it is plain that a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies.").  However, although it is "appropriate to afford pro se inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally."  Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006).

The facts alleged in the first grievance are substantially different than those alleged in the complaint.  Kelly is not named in the grievance.  The grievance mentions that a nurse inserted a catheter but does not mention any issues or complications with that procedure.  There is no claim that the catheter was the wrong type or unsterilized.  It does not claim any nurse failed in any

way, including by failing to use antibiotics.  Although the grievance states the nurses could not

contact the hospital as instructed, the grievance does not allege any harm arising from this.

Furthermore, the grievance contains no allegations of any wrongdoing by the doctor on call.[9]

The first grievance describes plaintiff's encounter with Dr. Benhein and Kelly on April

17, 2013, as a standard, unremarkable visit to the clinic.  Such allegations do not give notice to

prison officials of any problem or raise any issue for them to resolve.  Therefore, the first

grievance does not provide sufficient notice concerning plaintiff's claims against Dr. Benhein or

Kelly for exhaustion purposes.

The third grievance does state wrongdoing on behalf of Dr. Benhein and Kelly arising

from a sick-call on April 17, 2013.  However, defendants argue that because plaintiff had not

appealed this grievance through CORC review before filing this lawsuit, he did not exhaust his

administrative remedies.  See 42 U.S.C. § 1997e(a).

Plaintiff argues that CORC appellate review was effectively unavailable, and therefore

not required to exhaust his claims.  He argues he asked certain IGP personnel to send his

grievance to the next level of the review when decisions on his grievances were not made in a

timely fashion, but they did not do as requested.  Plaintiff argues this is sufficient to render

CORC appeal unavailable under Ross v. Blake, 136 S. Ct. 1850 (2016).

This is wrong.

The IGP provides a clear process, including defined deadlines, as to how and when to file

and appeal grievances at the various stages of the IGP, and allows a grievant to bypass levels of

review when a grievance has not received a timely decision.  N.Y. COMP. CODES R. & REGS. tit.

---

[9]     The version of events in the grievance mentions Dr. Burnstein, but in the complaint Dr.
Burnstein has been replaced by Dr. Benhein.

7, §§ 701.5, 701.6; see also Garvin v. Rivera, 2015 WL 876464, at *4 (S.D.N.Y. Feb. 28, 2015)

("Courts in this Circuit have consistently held that the failure to take an available administrative

appeal, even when the initial grievance receives no response, constitutes a failure to exhaust

available administrative remedies.").[10]   Plaintiff's informal efforts outside the IGP requesting his

grievance be sent to the next level of IGP review is not a replacement for the formal process.

See, e.g., Macias v. Zenk, 495 F.3d 37, 44 (2d Cir. 2007) (rejecting argument that prisoner's use

of informal steps outside the formal grievance procedure satisfies the exhaustion requirement).

Plaintiff's argument that CORC review was unavailable is belied by the fact that he

formally appealed the third grievance to CORC.   Plaintiff has submitted documents showing he

did appeal the third grievance to CORC, although not until after he filed the complaint in this

case, which is insufficient for PLRA-exhaustion purposes.   See, e.g., Neal v. Goord, 267 F.3d

116, 122 (2d Cir. 2001), overruled on other grounds by Porter v. Nussle, 534 U.S. 516, 532

(2002); Lopez v. Cipolini, 136 F. Supp. 3d 570, 582 (S.D.N.Y. 2015).

Thus, plaintiff's third grievance did not exhaust plaintiff's remedies with respect to his

claims against Dr. Benhein or Kelly.

Accordingly, plaintiff's claims against Dr. Benhein and Kelly are dismissed for failure to

exhaust.

B.     Hale

Plaintiff alleges Hale violated his Eighth Amendment rights under a theory of supervisory

liability.   Plaintiff alleges Hale reviewed his medical files, made a determination on plaintiff's

grievances, and did not remedy the unconstitutional acts of prison personnel.

---

[10]     Plaintiff will be provided with copies of all unpublished opinions cited in this decision.
See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Defendants argue this claim must be dismissed because plaintiff has not filed any fully exhausted grievance related to Hale.

First, plaintiff argues the third grievance satisfies the exhaustion requirement.

For the reasons explained above, this argument is without merit.

Second, plaintiff argues there is no grievance procedure available against Hale, because "[a]n individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable." N.Y. COMP. CODES R. & REGS., tit. 7, § 701.3(e)(1). Plaintiff contends that IGP decisions belong in this category, such that Hale's actions and inactions are non-grievable and are therefore without an administrative remedy to exhaust, such that the PLRA does not bar his claim.

Plaintiff's argument misunderstands his claim against Hale.

The regulation states that "an individual decision or disposition" is non-grievable.[11] But plaintiff's claim is not based allegations of a wrongful individual decision or disposition. Rather, plaintiff's claim is based on allegations that Hale willfully refused to right a known wrong and conspired to keep plaintiff uninformed of his medical condition. Thus, these claims are grievable, but plaintiff failed to follow the grievance process regarding these claims. Therefore, plaintiff has not exhausted his administrative remedies as to his claims against Hale.

Accordingly, plaintiff's claims against Hale are dismissed for failure to exhaust.

---

[11]    In this context, it appears that this regulation prevents an inmate from filing a second grievance based on the denial of a first grievance.

IV.     Eighth Amendment Claims

Remaining are plaintiff's claims against Dr. Chakravorty and Dr. Burnstein for deliberate indifference to plaintiff's medical needs in violation of plaintiff's Eighth Amendment rights.  Dr. Chakravorty and Dr. Burnstein move to dismiss these claims pursuant to Rule 12(b)(6) for failure to state a claim.

To assert a claim for constitutionally inadequate medical care under the Eighth Amendment's ban on cruel and unusual punishment, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  This test has both an objective and a subjective component: plaintiff must plead facts showing (i) the alleged deprivation of medical care is "sufficiently serious," and (ii) the officials in question acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006).

The objective component has two subparts.  "The first inquiry is whether the prisoner was actually deprived of adequate medical care," keeping in mind that only "reasonable care" is required.  Salahuddin v. Goord, 467 F.3d at 279 (citing Farmer v. Brennan, 511 U.S. 825, 839–40 (1970)).  "Second, the objective test asks whether the inadequacy in medical care is sufficiently serious" by examining "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  Salahuddin v. Goord, 467 F.3d at 280 (citing Helling v. McKinney, 509 U.S. 25, 32–33 (1993)).

In determining whether an alleged injury is a "serious" medical condition, "factors that have been considered include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and

substantial pain.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting McGuckin

v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992)).  In cases challenging the adequacy of the

medical treatment given, "the seriousness inquiry is narrower.  For example, if the prisoner is

receiving on-going treatment and the offending conduct is an unreasonable delay or interruption

in that treatment, the seriousness inquiry 'focuses on the challenged delay or interruption in

treatment rather than the prisoner's underlying medical condition alone.'"  Salahuddin v. Goord,

467 F.3d at 280 (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)).

    The subjective component requires a showing that the defendants were aware of

plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm.

Salahuddin v. Goord, 467 F.3d at 280.  "[T]he charged official must act with a sufficiently

culpable state of mind."  Id. (quoting Wilson v. Seiter, 501 U.S. 294, 300 (1991)).  It is well

established that "negligence, even if it constitutes medical malpractice, does not, without more,"

give rise to a constitutional claim.  Chance v. Armstrong, 143 F.3d at 703.  "[M]ere disagreement

over the proper treatment does not create a constitutional claim.  So long as the treatment given

is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an

Eighth Amendment violation."  Id.  "[D]isagreements over medications, diagnostic techniques

(e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their

intervention, are not adequate grounds for a Section 1983 claim."  Sonds v. St. Barnabas Hosp.

Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001)  Issues as to the proper course to

diagnose and treat an inmate "implicate medical judgments and, at worst, negligence amounting

to medical malpractice, but not the Eighth Amendment," id., at least when there is no allegation

of "an act or failure to act by the prison doctor that evinces 'a conscious disregard of a

substantial risk of serious harm.'"  Chance v. Armstrong, 143 F.3d at 703 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)).

 Plaintiff alleges both Dr. Chakravorty and Dr. Burnstein provided treatment that was responsive to plaintiff's complained-of symptoms and conditions.  At the outset, defendants responded to plaintiff's complaints by conducting extensive diagnostic testing.  When plaintiff's symptoms persisted, defendants responded with further diagnostics and treatments.  These tests revealed that plaintiff suffered from bacterial prostatitis and an enlarged prostate, and corresponding symptoms.[12]  Defendants provided plaintiff multiple courses of antibiotics to treat his prostatitis and Tamsulosin to treat his enlarged prostate, and eventually plaintiff underwent surgery.

Plaintiff's allegations amount to no more than disagreements as to the proper way to diagnose and treat plaintiff's medical conditions.  These allegations fall far short of alleging either Dr. Chakravorty or Dr. Burnstein acted with a sufficiently culpable state of mind to violate plaintiff's Eighth Amendment rights.

Accordingly, plaintiff's claims against Dr. Chakravorty and Dr. Burnstein are dismissed under Rule 12(b)(6) for failure to state a claim.

V.   Leave to Amend

A district court ordinarily should not dismiss a pro se complaint for failure to state a claim "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  Cuoco v. Moritsugu, 222 F.3d 99, 112

---

[12]   Plaintiff's issues related to his allegedly collapsed bladder did not arise until after plaintiff filed his last fully-exhausted grievance, and thus are not included in the grievance. Accordingly, for the reasons explained above, the Court cannot address the merits of any claims of deliberate indifference to plaintiff's allegedly collapsed bladder.

(2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)).  A court must grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."  Gomez v. USAA Fed. Sav. Bank, 171 F.3d at 796.

With respect to the claims that were not exhausted, leave to amend would be futile because plaintiff cannot cure the stated deficiencies.  Plaintiff cannot truthfully allege facts sufficient to show that he properly grieved his claims against Dr. Benhein, Kelly, or Hale.

Regarding plaintiff's deliberate indifference claims against Dr. Chakravorty and Dr. Burnstein, the complaint, even liberally construed, does not contain allegations suggesting plaintiff has valid deliberate indifference claims that he has merely "inadequately or inartfully pleaded" and therefore should "be given a chance to reframe." Cuoco v. Moritsugu, 222 F.3d at 112.  Liberally construed, the complaint suggests only that Dr. Chakravorty and Dr. Burnstein provided medical treatment with which plaintiff disagrees, and plaintiff's allegations refute any suggestion that either defendant acted with a sufficiently culpable state of mind.

Granting plaintiff leave to amend any of his claims would be futile because the problems with plaintiff's claims are substantive, and supplementary or improved pleading will not cure the deficiencies of the complaint.  Cuoco v. Moritsugu, 222 F.3d at 112.

Accordingly, the Court declines to grant plaintiff leave to amend.

**CONCLUSION**

The motion to dismiss based on Rule 12(b)(6) is GRANTED as to defendants

Chakravorty and Burnstein.  As to the remaining defendants, the motion to dismiss is converted

to a motion for summary judgment, Fed. R. Civ. P. 12(d), 56, and that motion is also

GRANTED.

The Clerk is instructed to terminate the motion (Doc. #27) and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order

would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose

of an appeal.  See Coppedge v United States, 369 U.S. 438, 444–45 (1962).

Dated: March 28, 2017
         White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge